We have a supervising attorney present, is that correct? And would that be Mr. Afrasiabi? All right, so you'll be here with the students. Thank you. All right, and I've been advised by the clerk, we won't start your clock time, but just to be so that we're on the same page, is that the appellant will be sharing time, and that each of the appellants will take six minutes each, and then they wish to each reserve a minute and a half on rebuttal. That's hardly very much time, but if you're in the middle of the sentence, that might not stop you. I might be charitable at that point, but basically so, and I might be making an assumption, but are you Mr. Westmoreland? I am. All right, so we're ready to start, and so it's my understanding you have a total of, you're splitting your time equally, and so you'll use six minutes right now on the clock, is that correct? Yes. All right, so if you want to start and tell me your name and who you're appearing from, we're ready to hear your argument. Yes, good morning, Your Honor. If it pleases the court, my name is Richard Westmoreland, and I'm an admitted law student appearing. Can you stop it for one second? I want to ask, so Mr. Stanton's not using the, who's using the? Mr. Stanton is here. Okay, Mr. Stanton, are you hearing us okay? Are you getting the communications okay? Every line of the caption is working just great, yes. Okay, is it helpful if we don't go really fast? Is that helpful? It's helpful, but reality being reality, it doesn't always happen, so we'll do our best. Well, Judge Van Dyke talks faster than anyone that I know, and I might be the second fastest talking person. I don't know what she's talking about. But that being said, since you're appearing by Zoom, if you are experiencing any technical difficulties or we're speaking too quickly, I know people don't like to interrupt judges, but please feel free to. The combination of the Zoom situation, I want to make sure that everyone is doing that. Can we start back at the six minutes since I'm taking everyone's time? All right. Good morning. If it pleases the court, my name is Richard Westmoreland, and I am an admitted law student appearing under the supervision of Peter Afasiabi. On behalf of Petitioner, Watcher, and Law and Seizure, I will be addressing the particularly serious crime determination, and my co-counsel will be addressing the denial of cat relief. And as you know, we'd like to reserve three minutes for rebuttal. Can you use your outdoor voice a little louder? Okay, yes. With regard to the particularly serious designation, this court retained jurisdiction to determine whether the agency applied the correct legal standard in that it relied on, first, the appropriate factors, and second, the proper evidence in making its determination. In this instance, the agency fell short on both counts. To the first of these reasons, whether the appropriate factors were employed, the agency's analysis must be based on the Francesco factors, a framework that the IJ's decision, in fact, does not refer to even once. The BIA decision does state that Francesco supplies the controlling standard, but it fails to explain how the IJ's findings satisfy that framework, and it adds no new findings of its own. In analysis under Francesco, all relevant evidence that can eliminate a conviction is normally considered. Several such key pieces of evidence that are required by the second and third of those factors were ignored here. So to each factor, the second factor concerning the type of sentence imposed required the IJ to consider the drastic sentencing reduction that was granted to our client and its implications for her culpability for the offense, yet this was not even mentioned. The government originally issued... Well, I guess when you say it wasn't even mentioned, you know, some things are just obvious from the record. Obviously, if you know what the guidelines are for that type of crime and the IJ is aware of the fact that she was trafficked and then she became a trafficker and the guidelines are much higher and she got a very light sentencing for trafficking, then why isn't it just inherent to everything that... We may not always be the sharpest knife in the drawer, but it's pretty obvious from this that this individual was given consideration by virtue of the fact that she was originally abused and later became the abuser. Yes, Your Honor. Indeed, I agree that it is apparent from the record that she received the reduction, but in the IJ's decision, she refers only to the 47 months. She doesn't even refer to... I would submit that it is a separate fact that she was granted an enormous reduction of less than 20% of what even the government had requested for her. Why do you think she was granted that enormous reduction? Well, Your Honor, we don't know. We do know that it was granted by the... Why do you think she... Perhaps it was a value judgment on the part of the district judge. It was probably a value judgment because she had been trafficked before she became a trafficker, I would think. I mean, within that, the most likely. And the immigration judge did mention that. Correct? Did mention that. So if the immigration judge mentioned the reason why she had... that would make the most sense as to the reason why she had gotten such a small sentence and actually mentioned that, then it seems a little bit super technical to say, well, she didn't particularly mention that she had gotten a less sentence, but did mention the best understanding of why she would have gotten that less sentence, that lower sentence. But is it possible that that extremely lowered sentence was the result of a 5K motion that's for her cooperation and thus it wouldn't have borne so much on the circumstances of the offense as her cooperation, but we don't know that from the record. We don't, Your Honor. We do know that the government's request was for a sentence of 292 months for her substantial assistance that was granted, and that this was granted later by the judge on his own. So how will that overall defeat whether this is a particularly serious crime? Well, Your Honor, the controlling standard for determining whether an offense constitutes one, of course, it still goes back to the most important point being it goes to the dangerousness standard, and the crime is particularly serious if it would, I believe the language in there is that if it would indicate that the person was a danger to the community based on, it is a PLC if it would justify the dangerousness to the community. You know, I realize you don't have a lot of experience going to court at this point, but you briefed sites Flores Vega and such. No, there's one in here that cited, I think, that you were for the proposition that the IJ here was wrong to simply rely on the plea agreement in making a particularly serious crime determination. But wouldn't you agree, or could you not surmise, that her plea agreement was far more detailed than the one at issue in Flores Vega in terms of describing the facts and circumstances of the petitioner's conduct? And if that was so, why couldn't the agency rely on the detailed recitation of the facts contained in her plea agreement? Well, Your Honor, when a plea agreement is relied upon exclusively as the sole of an internal resource, it, by definition, can't satisfy Frentescue because a plea agreement, Frentescue requires a much broader set of factors to be considered under the type of sentence imposed and the nature and circumstances of the conviction. And just speaking chronologically, you can't... But it's the factual basis for the plea. Yes, Your Honor. And the plea agreement is, of course, a valid piece of evidence that should be considered. But when it's considered not alongside other valid mitigating evidence, the plea agreement is not a proper case-by-case analysis that is required by Frentescue. We've already gone over time, but if my colleagues have questions, I won't count it against you. I want them to have their questions answered. So would you like to ask them any questions at this time? If I could have just a brief question. It's not on the subject that you've discussed so far, but I'm interested in the relationship between when the petitioner's family received the visitations from the police and so forth, and that was in 2016, 2017, and her credible fear of torture, those threats happening five or six years or more ago, and her assertion of a credible fear. How do you deal with that gap in time? Is that in your area? It's not, but I could speak to that just briefly before I turn it over. Okay. Your colleague, his colleague is taking cap. Hold that thought. We'll take it. I'll save time on your part. I would just say quickly, though, that it would make sense that at the time of the visits to the house, they were attempting to prevent her from testifying, to prevent her from cooperating. It failed, and so there's no reason for them to continue and potentially threaten the family. All right. So that will conclude your part right now, and then I'll give you a minute and a half for rebuttal. Thank you. All right. Now I believe we're going to hear from Ms. Weissel. I think it's her. Are you trying to participate? You want to test it before I start your thought? Yes. Can you hear me okay? It's soft. You speak a little bit more. Okay. Is it? Is that better? Yes. Okay. Ready. Okay. Good morning, Your Honors, and may it please the Court. I'm Colleen Weissel for Petitioner, and I will be arguing for cap relief. In concluding that Ms. Lawansi-Jen did not face a sufficient particularized threat of torture, the agency ignored evidence that the trafficking ring is aware of her cooperation with the U.S. government and that members of that trafficking ring have threatened her as a result. In Colby-Holter, this Court reversed the denial of cap relief where, as here, the agency overlooked pertinent evidence in the record. This Court stated that where there is any indication the agency did not consider all evidence, the decision cannot stand, and that failure to mention highly probative evidence is such an indication, and that is exactly what occurred in this case. The agency did not mention the fact that Ms. Lawansi-Jen testified before a grand jury at page 173 and 406 of the record, that the person who recruited her into the trafficking ring told another member of that ring that it was her who gave their names to the police and that she was angry as a result at page 275. That when asked that she had been threatened by her co-defendants, she responded in the affirmative at page 182. She also raised this in her appeal to the BIA at page 14. They also overlooked the striking similarity between the suspicious death of her uncle and a very similar incident involving the brother of a co-defendant. Both her and the co-defendant had previously cooperated with the U.S. government, and in both cases, unknown groups of teenagers got into altercations with these relatives, and then in Ms. Lawansi-Jen's uncle's case, he was found dead in the street with bruises on his neck, suggesting he'd been strangled. The teenagers returned to the co-defendant's brother's house later that night and shot inside of the house, indicating that they intended to harm him. The agency overlooked the similarity between these two incidents. These incidents further demonstrate that the trafficking ring adheres to its cardinal rule that Ms. Lawansi-Jen violated by cooperating with the U.S. government. If you are arrested, do not talk to the police. If you say anything, there will be trouble for you and your family. There's other evidence in the record, too, showing that the trafficking ring adheres to this rule. The ring hospitalized another victim's relative, according to a news article at page 300, and when asked if Ms. Lawansi-Jen knows what happens to those who cooperate with the trafficking ring, she said she spoke of a woman in Japan who was given an overdose and pushed off of her roof at page 197. Can I stop that for just off the clock for a second? I'm sorry. Is this coming through okay? I understand. Okay. Does that podium raise a little? It seems that when she gets closer, she's trying to pull it closer. Does it raise at all? Okay. All right. Go ahead. Sorry. No, it's okay. I just don't want you to be distracted. All right. In fact, the IJ conceded that traffickers often harm those who speak out against them, which shows that the trafficking ring's awareness of her cooperation would have fundamentally altered their analysis. I think Judge Arterton had a question. Did you want to interpose it at this point? It really was this timing question. All of those incidents that you're talking about preceded her application by, what, five or six years, something like that? All of those incidents occurred in 2017, and in that time, now she is in prison, and she has since continued to be threatened, but that was out of the record because that occurred at a later date. So how do we consider the seriousness or the viability or the reality of the threats with this gap in time and also the change in the posture of the case? Well, Your Honor, the threats continued, again, when she went to prison. So the government, in fact, protected her in prison because a co-defendant was trying to fight her and had threatened to kill people in Thailand. That's in our request for judicial notice. And the government recognized that this was serious and it was a credible threat to her safety. So the threat has continued. It has not stopped. But, yes, that is not in the record because, again, it occurred at a later date. And, in fact, the government should be estopped from arguing that Ms. Lamont's agent does not face a real threat to her safety while taking those steps to protect her in prison. And it's failure to consider the threat. But she did never testify in open court, right? So she never actually testified as a witness. Is that correct? She testified before a grand jury. It's correct that she did not testify in open court. However, the agency never stated that she did testify before a grand jury and that the members of the ring were aware of her cooperation. There was evidence of that in the record as well, which was overlooked. But, yes, she did not testify in open court. So what evidence did she put in the record about her mental health before the IJ? That might be a better question for my co-counsel, but I know that she did testify that being a victim of trafficking nearly broke her, being forced to engage in sexual relations against her will, and being held by this trafficking ring almost broke her mentally. So she did testify to that fact, but, again, my co-counsel is more prepared to address that. And seeing that I have 30 seconds left, I will turn to acquiescence. And with respect to government acquiescence, this case is very similar to Drang v. Ashcroft, and this court reversed on similar acquiescence evidence there. There, too, there was collusion by lower-level government officials, despite the national government's efforts to combat human smuggling. And this court stated that acquiescence also includes turning a blind eye. Here, too, the agency overlooked evidence that Thai government officials are directly complicit in the activities of the very trafficking ring involved in this case. Ms. Luangsujan testified that corrupt immigration officials sent her through a special channel when she was a trafficking victim at page 175-76, that police who were corrupt gave her a special passport stamp and escorted her to the plane, page 177-78. As you're in overtime, the clock goes down and then it goes up. I'm going to ask my colleagues if they have any questions that they want to ask you now. If there was in the country report an indication that Thai officials were trying to do something that was about remediating trafficking, why wouldn't that lead to the conclusion that they would protect her if she were sent home? Well, Your Honor, again, that is similar to the evidence that was presented in Jagme Ashcroft, but acquiescence also includes turning a blind eye, and it also applies when lower-level officials would be complicit and would turn a blind eye. So it doesn't require that the national government endorse this behavior, and there is evidence of, again, directly complicit government officials in this case helping traffic her. So despite many efforts by the national government, this court reversed in Jagme Ashcroft where those efforts were also present. All right. Thank you. Do you have any questions? All right. Thank you, Your Honor. We've taken you over, but we did that. You did not. So we're going to go now to the appellee, and so I'll turn it over to you, Mr. Stanton. Good morning. Oh, you're quiet right now. Yeah. All right. All right. I can hear you now. Thank you. Thank you. Let it please the Court. As does the Court, a respondent typically acknowledges and appreciates the co-bond efforts of the UC Irvine Legal Clinic. That said, most respectfully, the petitioner has not met her burden of showing an abuse of discretion in determining that she committed a particular insurance crime or for the record of controversial agency denial of her application for the Convention Against Torture Protection with respect to a particular serious crime determination. After the indictment was first brought, criminal torture was first brought, against the petitioner and her co-conspirators, the Department of Justice released an additional press release. It's located on page 296 of 298 of the administrative record. In that press release, former Attorney General Roberta Lynch expresses her opinion that human trafficking is a very mild and odious offense. As far as I can tell, one of her successors disagreed with her in that regard. Indeed, this Court and others have expressed similar sentiments that even human trafficking, that although it's fair that she commits human trafficking, it's not categorically a serious offense. It's definitely a very inherent serious offense. I don't think the petitioner herself disputes that. Well, let me ask you a question, Mr. Stanton. In Gomez-Sanchez v. Sessions, we stated that the IJ must take, quote, must take all reliable, relevant information into consideration when making a particularly serious crime determination, quote, including the defendant's mental condition at the time of the crime, unquote. Is there any evidence in the record that the petitioner's mental health was ever considered by the IJ here? Well, as we said in our answer in brief, Your Honor, this Court clarified the whole thing in that case, if I have to say correctly, says that so long as the petitioner has counsel, there is no requirement that the immigration judge delve into the issue of mental health to the extent the evidence was presented. I mean, and I don't believe she testified. I think the evidence of her mental health was only in her written declaration. So to the extent the agency actually considered the evidence, the agency said that it took all evidence into consideration in the petitioner's particular individual circumstances in determining the particularly serious crime determination, in making the particularly serious crime determination. Under this Court's precedent, Loretta Martinez resigned in her brief. I mean, if the agency says that, then the Court should be inclined to believe the agency unless there's affirmative evidence that the evidence was not considered. So, for example, if the agency expressly says it's not going to consider that evidence, there's nothing of that sort in here. Now, the petitioner's counsel cites the decision of Cole v. Holder. But with all due respect to Ms. Riesel, I think she's kind of missing the point of the Cole v. Holder case. I've never seen a petition from this Court discussing the interplay between Loretta Martinez and Cole. But one way to reconcile the two, there is some tension. Cole did say that while they will generally assume that the evidence was considered, that the evidence is either highly probative or potentially dispositive, that it should be discussed in the opinion. And with all due respect, I don't think evidence of the mental health here reaches those two thresholds. I mean, that there's no indication that, I mean, at most here, her mental health might have been impacted, but there's no indication she was incompetent or, I mean, had absolutely no idea what she was doing. Otherwise, she would have been convicted. So there was the plea colloquy, correct? The plea colloquy was before the IJ. Would you describe that plea colloquy as fairly specific or was it truncated or the factual basis for the plea, what was in that? It was not extensive. Truncated might be a bit unfair, but I think it was sufficient. Again, according to the legal decision, I mean, it was incumbent upon her counsel to make a bigger deal of the mental health if there was indeed a bigger deal, so to speak. I think counsel for the appellant noted that she, somewhere in the testimony, was that she was broken by having been trafficked. Was that in a declaration or was it in direct testimony? But it was before the court. Do you know how it came in? It was in the written declaration. She said she was very depressed, ashamed, and she said she almost went crazy. But, again, in her declaration she was talking about, I think at the time she was actually a human trafficking victim. That ended around 2009, 2010. She committed a crime. She joined the conspiracy in 2012, did so all the way through 2016. So, I mean, with all due respect, it's, I think, just too far of a leap to say that she had absolutely no idea what she was doing for 40 years. So, because of the abuse that she experienced as a human trafficking victim, I mean, again, she was convicted. There's no indication of diminished capacity in the plea agreement, no indication of incompetency. And even if there are, in doubt, we'll be able to cite cases. Just because she may or may not possess some mental disability does not mean she's incompetent, though. So, I mean, I think it's fair to assume, like, the records really doesn't compel a buy in if she did not know what she was doing at the time that she committed the crimes. So. So, I think regarding the government's potential acquiescence in the petitioner's torture, is the petitioner's testimony that she personally saw government agents helping the trafficking organization in the past relevant to the inquiry? If so, how much weight should we give that testimony in determining whether the government is likely to acquiesce in the organization's attempts to torture, petition, or retaliation? She did, indeed, testify that the pri-immigration customs officer waived her and her other victims at the time through customs at the Epcot airport. And so, I mean, our position is that given the entire weight of the evidence, merely because, like, some low-level corruption exists, I mean, given the efforts that the Thai government, like, did not compel the conclusion that the Thai government would acquiesce into torture against trafficking victims. I mean, like, very recently, the court in Ming Dai, Virginia, Ireland, a Supreme Court decision reiterated the very, very high standard to meet to overturn the denial of attack claim. The record really does compel conclusion. And the fact that these low-level, I mean, Thai immigration agents were being paid off by the traffickers does not compel the conclusion that the Thai criminal officials would likewise not want to protect petitioners. Given the record, given the evidentiary record from the country conditions reports, that the Thai government is, indeed, making a great effort to protect human trafficking victims, as well as prosecute those committing human trafficking offenses. So, and I also want to reiterate that even if you only get to the acquiescence issue, if you conclude there's a symmetric burden showing a likelihood of future torture, and with all due respect, she has not made that 50% threshold. I mean, the things she talks about, the instance regarding her family in Thailand, I mean, so the police visited her family. She said that, like, suggested to her that they may, that she may want to take a petitioner's name off the property deed. I mean, I've worked at DOJ for about seven years now. I've seen a lot of threats. That's a threat that doesn't really strike me as something like, well, we're going to kill you. I mean, so it might have been, but the record truly does compel the conclusion that that's the type of threat that shows a high likelihood of torture. Likewise, the fact that her mother signed a piece of paper for the police, I mean, she doesn't know what it is. It's certainly possible it's something to bar this, but, I mean, without more proof, we don't think that meets the main diet standard to kill her. So it certainly is, I'm sorry. Okay. No, I certainly understand that her uncle was beaten to death, but the only evidence she has tying the chronicle's death to her is the timing. This court especially rejected the use of the post hoc error, Proctor-Hock, to try to support claims for immigration relief. Likewise, there's no indication that her co-defendants' brother, I believe it was the brother, I mean, that it had anything to do with the co-defendants. I mean, the court should keep in mind there were a lot of defendants here in this case. If you go to pages 298 to 295, there were 36 defendants that were actually found guilty in this conspiracy, and that's not counting the people, like, who charges were brought against, that either were acquitted or had charges dismissed. And so, I mean, a lot of people, bad things, it's just coincidence. Like, I mean, if you have that many people, sure, some bad things may or may not happen. But we're talking about that many people over a long period of time. And most respectfully, we do not believe that the petitioner preserved her argument, exhausted her argument that she was threatened by a co-defendant. Yes, she was asked in a testimony that she was asked if she had been threatened by a co-defendant. She said yes, and then immediately, it's on page 282, immediately she starts talking about things that happened in Thailand. She gives no specifics about anyone in the United States in the prison threatening her. And the page in the Administrative Appeal Brief that was sent out by Ms. Weissel in AR-14, she did refer to threats, but the citations in her Administrative Appeal Brief do not refer to the co-defendant. They refer exclusively to her family in Thailand. So the fact that she's relying now on this threat made by a co-defendant here, that was just never presented to the agency, at least not in a best or tertiary way, which is not the agency had no reason to believe that this was an issue. And so, I mean, that's also the whole predicate for her stop-all theory. So without, which also was not presented as well. I mean, there are probably good reasons why her counsel, Mr. Wong, did not present this testimony regarding this alleged threat by the co-defendant. For one thing, it was from a woman named Nancy, who was a co-defendant. Nancy's real name, according to page 401 of the Administrative Record, I don't know if I'm pronouncing it correctly, Kanang Indratong. So number one, it was a lower-level person on the conspiracy. I mean, the petitioner was a house boss. Nancy was on the facilitator. So there's no indication that Nancy had any real power. Number two, if you look at the docket sheet, it's the same docket number for what was cited from the Administrative Record for petitioner. The charges against Nancy were actually dismissed. So, I mean, Nancy was free to go. The charges were dismissed against Nancy in 2018. So if you look at page 288 to 295, they list all the defendants who were found guilty as a result of these prosecutions. Nancy is not on there. So, I mean, this threat is one from a lower-level person, from someone who was apparently free to go, not convicted. And the other thing is I forgot to mention is even though she does claim that Nancy threatened her family in prison, Nancy says she was going to harm her family in Thailand, I mean, the threat came in October of 2017, but her uncle was killed in June of 2017, a couple months earlier. So this threat, I mean, I think there's reasons why Mr. Wong, the petitioner's hearing counsel for the immigration judge, did not make a decision that it wasn't worth pursuing. So for all these reasons, we think that argument was not exhausted, and by extension, neither was this double argument. Let me ask, do either of my colleagues have any questions? I have a brief question. Go ahead. You referred earlier to the fact that the evidence of complicity was with low-level officials. Is there a case law that distinguishes between low-level and high-level officials in terms of where the turning the blind eye or acquiescing in the torture of a criminal organization? I mean, there's a case law that in some cases low-level officials could indicate that the government will acquiesce in torture. Usually those cases involve a policeman, someone in a position to actually do some real harm against the petitioner. In this case, immigration agents, I mean, I think this is too far a jump. I mean, what's next? I mean, the fact that some Thai agents in the parking department pick some parking tickets for this organization. What is it? The blind eye does not require the actual use of violence by those officials. The blind eye is we know what's going on, we know what's going to go on, and we are turning away from it. So that's what I'm asking you. Where do you make that distinction between low-level and high-level officials with respect to the issue of whether she has demonstrated, by her record, the reasonable risk of the torture? I would respectfully submit that the low-level officials have to be in a position to actually acquiesce to torture. So you would concede that a low-level person could actually meet that burden. The question here is, was the IJ, does it compel a different result? Is that what you're saying? I mean, you're not saying there is that it has to be a high-level person. It's a more totality of the circumstances, right, and the ways of the evidence. Yes, totality of circumstances is a very good way of putting it. Yes, there's certainly some conceivable circumstances where a low-level official could be part of the acquiescence. And so, again, usually it's a policeman. And so, I mean, if I recall correctly, that was the case that Ms. Risa was referring to. But in this particular case, customs officials, most respectfully, it's just too far an extension to the acquiescence. Okay, unless my colleagues have other questions. We've taken you into overtime, and that will conclude your argument. Thank you. All right, so we're ready for rebuttal. Each counsel for appellant has 90 seconds, or one minute and 30 seconds. Yes, I would just say, regarding Gomez. So it's you. It's Mr. Westmore, right? Mr. Westmore, yes. There is recognizance here of the mental health trauma that she experienced prior to making your decision to work more closely. It's in her written statement, pages 271 and 272 in the administrative record. And I would suggest that it is inherent in being trafficked and subjected to what she was for several years. But the object should have considered it. It should have been played on its face. What evidence do you have, if it's part of the record, that the judge didn't consider it? It's sort of like with jurors and judges. If something's in the record, there's somewhat of a presumption that we read it, we heard it, we looked at it. And just because we don't give it the same weight that you do doesn't mean we didn't look at it. So where in the record does it say that the judge, I'm just not looking at this, I don't care? There is an affirmative denial, Your Honor, of looking at it. It is stated as a bare fact in the record, and it's not referred to in the judge. No inferences are drawn from it, positively or negatively, as would be required in the Francesco analysis. I'm sorry. I'm not hearing you. Go ahead. Oh, I'm sorry. Am I speaking too low? It does appear in the record, but it is not in the analysis section of the IJ's decision. And no inferences are drawn from it, either positively or negatively. Judge Callahan's got a really good point, not as to this issue only, but also just I think your earlier issue about taking into account that they got a low sentence. You know, I was thinking about that more. And I'll give you time to answer this, because I'm really curious as to your responses. We get this a lot, especially in these immigration cases, where somebody will say that the IJ did not mention something, right? And so, therefore, but there is case law, I think you agree, that says that there's a presumption that the IJ, you know, considered everything. There's a presumption, and that presumption can be rebutted, but there's a presumption. So, I mean, it does seem pretty far-fetched to me that the IJ had to do a special, had to take, because it was less than five years, the IJ had to actually specifically address that, even because it was less than five years, that this would still be a particularly serious crime. And the IJ, I was looking back at the IJ's decision, the IJ addresses that pretty quickly, but addresses that, so it seems odd to me to think that the I, particularly odd that the IJ would not be taking into account when, the fact that this was a lower-end, lower-end sentence, when the IJ, the only reason the IJ had to do this analysis was because it was a sentence less than five years. You see what I'm saying? So, if you sort of, particularly in this case, it seems like it's hard to say that the, if there is a presumption, and our case law says there is, it seems hard to me, why would we think that the presumption was rebutted when the IJ here had to actually address, you know, had to actually do extra work because it was a lower-end sentence? Well, Your Honor, the extra work that was done, it does not appear in the record. I mean, it does not appear in the analysis section. Well, to be clear, the extra work, the particular thing that you're saying is missing being addressed explicitly, and that is that this was such a deviation from the sentence. That's not specific. But the IJ does say stuff about the fact that what the IJ is hammering, and we see this often, the IJ is hammering that this is a bad, bad crime, which is one of the fresh good factors, right? The IJ is really hammering that. The IJ is not necessarily, like, explicitly talking about the other factor that you think favors, but kind of built into that, I would think, especially if there's any kind of presumption, is that the IJ is just saying this weighs so heavily, it outweighs the other factor. And why is that not a proper way? I mean, I think you're pointing to the fact that it's not specifically talking about what's over on this side of the scale, but a presumption would seem to say that we assume that that's what the IJ is doing, even though it may not be explicitly saying that. Well, Your Honor, the presumption, which I believe is that Lorena Martinez is the case that establishes that presumption, I mean, I would just distinguish that by saying that that was a due process case where the client claimed that the board violated his rights of due process by failing to consider relevant evidence and must overcome the presumption they've interviewed the evidence. I mean, the constitutional claims have different standards of review and different levels of expectations. So is there argument that you don't think there is a presumption, or do you think there is a presumption here? I have not seen any case law submitted in this matter that indicates that, you know, IJs are presumptively entitled to this expectation in all cases, especially in working with different testing factors, which have very specific statutory and court-created requirements for analyzing them. Okay. All right. We've taken you into overtime, so thank you for your argument. Thank you, Counsel. Thank you, Your Honor. In response to respondents' claim that U.S. border or, pardon me, Thai border officials are lower level, first, I would contend that customs officials are not lower level agents, and further, there are also police that are complicit, and they were specifically trafficking Ms. Valancian. This is absolutely not comparable to someone giving out trafficking tickets. And with respect to the idea that two out of 36 defendants being threatened or having incidents occur that indicate the trafficking ring was seeking to harm them or retaliate, that is not a coincidence, and there is other evidence in the record that the trafficking ring will harm people that speak out against it. As I stated in my case earlier, a page 300 news report stated that this organization controls victims by prohibiting them from contacting anyone, threatening to hurt relatives in Thailand if they try to leave. And one victim testified that the organization sent thugs to hurt the relative who required hospital treatment. So this is not a coincidence. This is evidence that the trafficking ring is following its cardinal rule that Ms. Valancian violated by testifying. With respect to the argument that these threats are not sufficient to show that the trafficking ring is aware of her cooperation or that they're seeking to harm her, we have several pieces of evidence in the record showing that the ring was aware of her cooperation, and none of these were mentioned. So why don't you look at wrapping up in 30 seconds with those specific pieces of evidence? Yes, Your Honor. There is the evidence that all the members of the trafficking ring in the U.S. were arrested,  and there was the evidence that Ms. Valancian testified that the ringleader knows that she cooperated with the U.S. government. The person who sent her there, she said, knows everything that happened here. The fact that the recruiter was angry and said that she was the one who gave them to the police. Those arrested are only a small fraction of the ring. And finally, that there's no indication Thailand has done anything to take down this ring, which rebuts any presumption that the Thai government would protect her in any way. All right. Thank you, Your Honor. All right, thank you. This matter will stand submitted. I would once again like to thank everyone for appearing and the helpful argument. And regarding the statements, I would say that you've now done something that I never did. I never argued before the Ninth Circuit. So what you've proven is that you can swim with a big fish, and we look forward to welcoming you back either in your clinic or when you have passed the bar. So thank you for an excellent argument on both of your parts. This matter will stand submitted.
judges: CALLAHAN, VANDYKE, Arterton